**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
Michael Cohen, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: mcohen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CRAIG ROSS, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>DEVIN FINZER and ALEX ATALLAH,<br><br>    Defendants. | Case No: 25-cv-01179-DEH<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED<br><br>AMENDED COMPLAINT |

Plaintiff Craig Ross ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants Devin Finzer ("Finzer") and Alex Atallah ("Atallah"), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public statements, social media posts, authorities, media reports, websites, and other publicly available reports and information about Defendants and The NFTs (defined below), and information readily obtainable

on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery. Plaintiff hereby alleges as follows:

## INTRODUCTION

1.    For years, Defendants Finzer and Atallah promoted, advertised and hyped up an application and exchange called OpenSea[1] that they had founded in 2017 to sell securities called non-fungible tokens (often shortened to NFTs), crypto collectibles, or other crypto assets ("The NFTs") in violation of the law, damaging and injuring Plaintiff and Class members.

2.    There are various kinds of digital and crypto assets, including cryptocurrencies like Bitcoin and Ethereum. Bitcoin and Ethereum are commodities, not securities, because they are decentralized means of exchange. The price of bitcoin, for example, is subject only to market forces. There is no "Bitcoin Incorporated" managing the project.

3.    Other types of digital assets, however, derive their value from the success or failure of a given project, promoter, or start-up. Investors purchase this type of digital asset with the hope that its value will increase in the future as the project grows in popularity, based upon the managerial efforts of the issuer of the asset or token and/or those working to develop the project. Because this type of digital asset is properly classified as a security under relevant (including federal) law, the issuers of this type of token are required to file relevant statements with the authorities (including the U.S. Securities Exchange Commission (the "SEC")) and comply with relevant (including federal) securities laws.

4.    The NFTs sold by OpenSea are unique cryptographic tokens that exist on a blockchain—the digital database supporting crypto assets—and cannot be replicated. As The

---

[1] Ozone Networks, Inc. d/b/a OpenSea. Referred to herein as "OpenSea".

NFTs sold on OpenSea allow investors to bet on the value of the particular team or project behind a given token, The NFTs are classic examples of securities under the law, however, they were never registered as such.

5.    Defendants – both of whom are influential ringleaders in the NFT space – used their own, personal twitter (now known as "X") accounts to issue a barrage of materially misleading promotional statements designed to lure unsuspecting investors to the NFTs offered for sale on OpenSea.

6.    In late 2024, however, the SEC issued a Wells Notice to OpenSea, revealing the SEC's view that, after years of investigation and review of internal OpenSea documents, the NFTs that Defendants had long been promoting are actually unregistered securities essentially devoid of value.

7.    While news of the Wells Notice came as a shock to Plaintiff and others who believed the NFTs they were buying on OpenSea were legal and not unregistered securities, Defendants had long known that securities law violations were rampant on OpenSea and, in fact, OpenSea had been producing internal documents in connection with the SEC's securities law investigation for several years.

8.    Defendant Finzer now claims that the SEC has dropped its case as part of an about-face under a new presidential administration, but that is cold comfort to Plaintiff and others, whose crypto assets have been irrevocably tarnished at this point and, moreover, the decision whether The NFTs are securities under the law is one a court must make.

9.    Finally, very recently, in February 2025, Defendant Finzer took to twitter to promote a new version of OpenSea – "OpenSea 2.0" – that introduces cryptocurrency tokens alongside NFTs for the first time, offers a host of new tools aimed at professional crypto traders,

and appears to welcome back NFTs that had been banned, locked or delisted for, *inter alia*, violating the securities laws. What is more, Defendant Finzer even unveiled a new cryptocurrency token known as $SEA that will be used to reward loyal traders for using, and sticking with, OpenSea.

10.    Defendant Finzer is thumbing his nose at the law. OpenSea 2.0 is even more blatantly in violation of the securities laws than OpenSea 1.0, and it further tarnishes the assets that Plaintiff and others have purchased in good faith.

11.    Defendants should be held accountable for their own words. As a result of Defendants' materially misleading promotion of unregistered securities, Plaintiff and the Class— many of whom are retail investors who lack the technical and financial sophistication necessary to have evaluated the risks associated with their investment in The NFTs, and were denied the information that would have been contained in the materials required for the registration of The NFTs—have suffered significant damages in an amount to be proven at trial.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because: (1) there are 100 or more (named or unnamed) class members; (2) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest or costs; and (3) there is minimal diversity because at least one plaintiff and defendant are citizens of different states).

13.    This Court may exercise personal jurisdiction over Defendants because Defendants either reside in or maintain business in this District, maintain and have continuous and systematic contacts with this District, do substantial business in this State and within this District, and engage in unlawful practices in this District as described in this Complaint, so as to

subject themselves to personal jurisdiction in this District, thus rendering the exercise of jurisdiction by this Court proper and necessary.

14.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and (c) and 18 U.S.C. § 1965. Defendants centered their misconduct in this Judicial District and promoted, advertised, and hyped up The NFTs in this Judicial District. Moreover, subsequent damages took place in this Judicial District.

15.    Venue and jurisdiction are additionally proper in this District because many of the acts complained of herein, including the dissemination of materially false and misleading statements originated and/or occurred, at least in part, in this Judicial District. Further, Defendants sought investors in this Judicial District and encouraged their investment.

## PARTIES

16.    Plaintiff Craig Ross is a resident of Illinois. Plaintiff and members of the Class purchased The NFTs, unregistered securities.

17.    Defendant Finzer founded New York-based OpenSea. Defendant Finzer is OpenSea's Chief Executive Officer and lists his address, along with OpenSea's address, as 228 Park Avenue South #22014, New York, New York 10003.

18.    Defendant Atallah founded and repeatedly promoted OpenSea, and on information and belief lives in New York County, New York.

## BACKGROUND
### *Brief Overview of Crypto Assets*

19.    Crypto assets are digital assets designed to function as a medium of exchange, a store of value, or both.

20.    Cryptocurrencies rely on a variety of cryptographic principles to secure transactions, control the creation of additional units, and authenticate the transfer of digital assets.

21.     Bitcoin was the world's first cryptocurrency.  It is also the world's largest and most popular cryptocurrency, with a market capitalization over $2 trillion. Bitcoin was the fastest asset to reach a $1 trillion market capitalization, which it achieved in only twelve years.[2]

22.     At the core of Bitcoin is a public ledger that tracks the ownership and transfer of every unit of bitcoin. The ledger is known as a blockchain.

23.     Blockchains stand at the core of crypto assets. While their technical protocols vary, blockchains are generally designed to achieve similar goals of decentralization and transparency.

24.     Accordingly, blockchains are designed as a framework of incentives that encourage people to do the work of validating transactions. In the case of Bitcoin, those engaged in the validation must solve a "Proof of Work" mathematical problem by expending computational resources. The first person to solve the "Proof of Work" problem is rewarded in newly minted bitcoin. This process is known as "mining" bitcoin.

25.     Mining is one method of acquiring cryptocurrencies like bitcoin. Another is simply to buy cryptocurrencies from another party, typically on an online cryptocurrency exchange.

26.     While bitcoin was the only cryptocurrency listed on the exchanges shortly following its creation in 2009, there are now an ever-growing array of thousands of cryptocurrencies and other digital assets. Following the surge in cryptocurrency interest in recent years, the market capitalization of major cryptocurrencies has reached well over $3 trillion.

27.     Bitcoin is a commodity, and not a security, because it allows for fast and secure transactions, can serve as a long-term store of value, and is decentralized. Critically, Bitcoin is free from any government or private control. There is no entity behind Bitcoin that can cause the price

---

[2] Because the term "bitcoin" can refer to the system as well as the unit of exchange, the accepted practice is to use "Bitcoin" to refer to the system, and "bitcoin" to refer to the units of exchange or currency.

of bitcoin to increase through prudent management or decrease through mismanagement. Rather, the cost of bitcoin is determined solely by market forces, and one buying bitcoin is not investing in a common enterprise.

28.     Ethereum is the second-most popular cryptocurrency, with a market capitalization that is currently over $900 billion. Ethereum uses a blockchain similar to that used by Bitcoin. Most of the NFTs on OpenSea reside on the Ethereum blockchain.

29.     Unlike Bitcoin, however, Ethereum was designed to enable "smart contract" functionality. A smart contract is code that verifies and enforces the negotiation or performance of a contract. Smart contracts can be self-executing and self-enforcing, potentially lowering the transaction costs associated with traditional contracting.

30.     There are many uses for smart contracts. For example, two parties might enter into a hedging contract where both parties put up $1,000 worth of ether. The parties might agree that, in a month, one of them will receive $1,000 worth of ether at the dollar exchange rate at that time, while the other party receives the rest. Alternatively, a smart contract might be programmed to release funds only at a certain time, similar to a traditional escrow agreement.

*SEC's Approach to Crypto Assets*

31.     Aside from Bitcoin and Ethereum, there are myriad cryptocurrencies and crypto assets that are securities under the law, like The NFTs.

32.     Moreover, the definitions of "security" in Section 2(a)(1) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. 77b(a)(1), and Section 3(a)(10) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. 78c(a)(10), include not only conventional securities, such as "stock[s]" and "bond[s]," but also the more general term "investment contract."

33.     Along these lines, in *Reves v. Ernst & Young*, the United States Supreme Court

stated:

> The fundamental purpose undergirding the Securities Acts is 'to eliminate serious abuses in a largely unregulated securities market.' *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 421 U.S. 849 (1975). In defining the scope of the market that it wished to regulate, Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity, especially in the creation of 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits, *SEC v. W.J. Howey Co.*, 328 U.S. 293, 328 U.S. 299 (1946), and determined that the best way to achieve its goal of protecting investors was 'to define the term "security" in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.' … Congress therefore did not attempt precisely to cabin the scope of the Securities Acts … Rather, it enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment.

494 U.S. 56, 60–61 (1990).

34.    Crafted to contemplate not only known securities arrangements in existence at the time, but also any prospective instruments created by those who seek the use of others' money on the promise of profits, the definition of "security" is broad, sweeping, and designed to be flexible so as to capture new instruments that share the common characteristics of traditional securities. As Supreme Court Justice (and former SEC Commissioner (1935) and Chair (1936-37)) William O. Douglas opined in *Superintendent of Insurance v. Bankers Life and Casualty Co.*:

> We believe that section 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws.

404 U.S. 6, 14 n.7 (1971) (quoting *A. T. Brod & Co. v. Perlow*, 375 F.2d 393, 397 (2d Cir. 1967)).

35.    Federal courts have already confirmed the SEC's jurisdiction in numerous crypto-related emergency asset freeze hearings where the issue has been considered and affirmed, in the same way it has by federal courts across the country since *Howey*, which the Supreme Court

adopted over 75 years ago.[3] That decision resulted in the *Howey* Test, which is used to determine the presence of an investment contract. The *Howey* Test holds that an investment contract exists if there is an "investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others."[4] The *Howey Test* is the principal method used by federal courts, as well as the SEC, to determine if a given digital asset is a security.

36.    The SEC has used multiple distribution channels to share its message and concerns regarding crypto assets, digital trading platforms, initial coin offerings, and other digital asset products and services over the past decade. The SEC first made investors aware of the dangers of investing in digital assets in 2013 when the Office of Investor Education and Advocacy issued an Investor Alert on "Ponzi Schemes Using Virtual Currencies"[5]

37.    A year later, the same office issued an Investor Alert on "Bitcoin and Other Virtual Currency-Related Investments."[6]

38.    In 2017, the Commission took the rare step of releasing a Section 21(a) Report of Investigation that looked at the facts and circumstances of The DAO, which offered and sold approximately 1.15 billion DAO Tokens in exchange for a total of approximately 12 million Ether ("ETH") over a one-month period in 2016.[7]

39.    The SEC applied the *Howey* Test to the DAO tokens and concluded that they were

---

[3] *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).
[4] *Id.*
[5]
https://web.archive.org/web/20240227124314/https://www.sec.gov/investor/alerts/ia_virtualcurrencies.pdf.
[6] https://web.archive.org/web/20241121143702/https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-alerts/investor-39.
[7]
https://web.archive.org/web/20240828093936/https://www.sec.gov/files/litigation/investreport/34-81207.pdf.

securities under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act").[8] While The DAO, and DAO tokens, were no longer operational at the time due to a high-profile hack that resulted in the theft of most DAO assets, the SEC chose to release the report "to advise those who would use a Decentralized Autonomous Organization ('DAO Entity'), or other distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws."[9]

40.    In 2019, the SEC released a "Framework for 'Investment Contract' Analysis of Digital Assets" which provided additional details on when a digital asset has the characteristics of an investment contract and "whether offers and sales of a digital asset are securities transactions."[10]

41.    In addition, the SEC has publicized its position on digital assets, including cryptocurrencies, NFTs, and exchanges, in countless enforcement actions,[11] multiple speeches,[12] Congressional testimony,[13] and several official SEC statements[14] and proclamations.[15] The former SEC Chairman, Gary Gensler, has spoken frequently about the perils and illegality of crypto lending platforms and decentralized finance,[16] warning that their failure to register with the SEC

---

[8] *Id.*

[9] *Id.*

[10] https://web.archive.org/web/20241121144150/https://www.sec.gov/about/divisions-offices/division-corporation-finance/framework-investment-contract-analysis-digital-assets.

[11] https://web.archive.org/web/20241121144249/https://www.sec.gov/securities-topics/crypto-assets.

[12] https://web.archive.org/web/20241121144340/https://www.sec.gov/newsroom/speeches-statements/gensler-aspen-security-forum-2021-08-03.

[13] https://web.archive.org/web/20241121144436/https://www.sec.gov/newsroom/speeches-statements/gensler-2021-05-26.

[14] https://web.archive.org/web/20241121144700/https://www.sec.gov/newsroom/speeches-statements/statement-clayton-2017-12-11.

[15] https://web.archive.org/web/20241121144729/https://www.sec.gov/newsroom/speeches-statements/enforcement-tm-statement-potentially-unlawful-online-platforms-trading-digital-assets.

[16] https://web.archive.org/web/20230327041638/https://www.theblock.co/post/113416/gensler-speech-crypto-defi-lending-sec.

may violate U.S. securities laws. In one interview, Chair Gensler said:

> The law is clear, it's not about waving a wand. Congress spoke about this in 1934 … When a [digital] platform has securities on it, it is an exchange, and it's a question of whether they're registered or they're operating outside of the law and I'll leave it at that.[17]

42.    On September 8, 2022, Chair Gensler gave a speech reflecting on the flexibility of the securities laws and the SEC's consistency in applying these laws to cryptocurrency.[18] Chair Gensler noted that of the 10,000 different cryptocurrencies in the market, "the vast majority are securities," a position that was also held by his predecessor, Jay Clayton.[19] Chair Gensler went on to note that the SEC has spoken with a "pretty clear voice" when it comes to cryptocurrency "through the DAO Report, the Munchee Order, and dozens of Enforcement actions, all voted on by the Commission" and that "[n]ot liking the message isn't the same thing as not receiving it."[20]

43.    Importantly, the judicial record supports Chair Gensler's assertions, as the SEC has taken over 100 successful crypto-related enforcement actions.[21]

44.    While the view of the SEC – the traditional expert in the area of securities regulation – can be persuasive, there are other times when it is not. For instance, the Staff Statement on Meme Coins that the SEC Division of Corporation Finance published on February 27, 2025, while somewhat cursory, does not appear to be consistent with how courts in the Southern District of New York and elsewhere have applied the *Howey* tests to crypto assets. Ultimately, the decision whether any asset (including crypto asset) satisfies the *Howey* test is, of course, a judicial one. It

---

[17] *Id.*
[18] https://web.archive.org/web/20241121145059/https://www.sec.gov/newsroom/speeches-statements/gensler-sec-speaks-090822#_ftnref3.
[19] *Id.*
[20] *Id.*
[21] https://web.archive.org/web/20241003051605/https://www.cornerstone.com/wp-content/uploads/2023/01/SEC-Cryptocurrency-Enforcement-2021-Update.pdf.

is a decision a court must make.

45.     What follows are brief examples and summaries of the caselaw that will help inform this litigation.

*U.S. Sec. & Exch. Comm'n v. KIK*

46.     In *U.S. Sec. & Exch. Comm'n v. Kik Interactive Inc.*[22], the SEC's complaint, filed in the Southern District of New York on June 4, 2019, alleged that Kik sold digital asset securities to U.S. investors without registering their offer and sale as required by the U.S. securities laws. 1:19-CV-05244 (S.D.N.Y), Dkt. No. 1. Kik argued, among other things, that the SEC's lawsuit against it should be considered "void for vagueness."[23] *See U.S. Sec. & Exch. Comm'n v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 176 (S.D.N.Y. 2020).

47.     The court granted the SEC's motion for summary judgment on September 30, 2020, finding that undisputed facts established that Kik's sales of "Kin" tokens were sales of investment contracts, therefore of securities, and that Kik violated the federal securities laws when it conducted an unregistered offering of securities that did not qualify for any exemption from registration requirements. *Id*. The court further found that Kik's private and public token sales were a single integrated offering. *Id*. at 181-82.

*SEC v. Telegram*

48.     In *U.S. Sec. & Exch. Comm'n v. Telegram Group Inc., et al.*,[24] the SEC filed a complaint on October 11, 2019, alleging that the company had raised capital to finance its business

---

[22] https://web.archive.org/web/20241121145332/https://www.sec.gov/newsroom/press-releases/2020-262.

[23]

https://web.archive.org/web/20241121145524/https://www.financemagnates.com/cryptocurrency/news/sec-seeks-to-block-kik-subpoenas-refutes-void-for-vagueness-claim/.

[24] https://web.archive.org/web/20241121150530/https://www.sec.gov/newsroom/press-releases/2020-146.

by selling approximately 2.9 billion "Grams" to 171 initial purchasers worldwide. 1:19-cv-9439 (S.D.N.Y), Dkt. No. 1. The SEC sought to enjoin Telegram from delivering the Grams it sold, which the SEC alleged were securities that had been offered and sold in violation of the registration requirements of the federal securities laws. *Id*.

49.     On March 24, 2020, the court in the Southern District of New York issued a preliminary injunction barring the delivery of Grams and finding that the SEC had shown a substantial likelihood of proving that Telegram's sales were part of a larger scheme to distribute the Grams to the secondary public market unlawfully. *Id*. Dkt. No. 227.

50.     Without admitting or denying the allegations in the SEC's complaint, the defendants consented to the entry of a final judgment enjoining them from violating the registration provisions of Sections 5(a) and 5(c) of the Securities Act of 1933. *Id*. Dkt. No. 242. The judgment ordered the defendants to disgorge, on a joint and several basis, $1,224,000,000 in ill-gotten gains from the sale of Grams, with credit for the amounts Telegram pays back to initial purchasers of Grams. *Id*. It also ordered Telegram to pay a civil penalty of $18,500,000. *Id*. For the next three years, Telegram was further required to give notice to the SEC staff before participating in the issuance of any digital assets. *Id*.

*U.S. Sec. & Exch. Comm'n v. BlockFi*

51.     In *BlockFi Lending LLC*,[25] the first SEC case involving a crypto-lending program, on February 22, 2022, the SEC charged BlockFi with failing to register the offers and sales of its retail crypto-lending product and also charged BlockFi with violating the registration provisions of the Investment Company Act of 1940.[26]

---

[25] https://web.archive.org/web/20241121150850/https://www.sec.gov/newsroom/press-releases/2022-26.
[26] *Id*.

52.    BlockFi argued for "increased regulatory clarity" but lost.[27]

53.    To settle the SEC's charges, BlockFi agreed to pay a $50 million penalty, cease its unregistered offers and sales of the lending product, BlockFi Interest Accounts (BIAs), and bring its business within the provisions of the Investment Company Act within 60 days.[28] BlockFi's parent company also announced that it intends to register under the Securities Act of 1933 the offer and sale of a new lending product. In parallel actions, BlockFi agreed to pay an additional $50 million in fines to 32 states to settle similar charges.[29]

*U.S. Sec. & Exch. Comm'n v. TerraForm Labs Pte. Ltd.*

54.    In *U.S. Sec. & Exch. Comm'n v. Terraform Labs PTE, Ltd. and Do Hyeong Kwon*, on July 31, 2023, Judge Jed Rakoff of the Southern District of New York entered an order denying a motion to dismiss claims that defendants, a crypto-assets company and its founder, were responsible for a multibillion-dollar fraud that involved the development, marketing, offer and sale of crypto-assets that the SEC alleged were unregistered securities. 684 F. Supp. 3d 170.

55.    Judge Rakoff explicitly rejected a key component of his colleague, Judge Analisa Torres' reasoning in her order on cross-motions for summary judgment in *U.S. Sec. & Exch. Comm'n v. Ripple Labs, Inc*., et al., No. 1:20-cv-10832, Dkt. No. 874 (S.D.N.Y. July 13, 2023), which drew a distinction between crypto assets sold directly by the issuer or on the secondary market. 684 F. Supp. 3d at 197-98.

56.    Judge Rakoff is a highly regarded jurist who is considered an expert in securities law and business law. In fact, Todd Baker, an attorney and Senior Fellow at the Richman Center

---

[27] https://web.archive.org/web/20220214161936/https://blockfi.com/pioneering-regulatory-clarity.
[28] https://web.archive.org/web/20241121150850/https://www.sec.gov/newsroom/press-releases/2022-26.
[29] *Id*.

for Business, Law & Public Policy at Columbia Business and Law Schools called Judge Rakoff, in a *Financial Times* article, the "most respected securities authority in the federal judiciary."[30]

57.    Judge Rakoff also explicitly rejected a key element of Judge Torres' analysis in the Ripple decision, stating:

> It may also be mentioned that the Court declines to draw a distinction between these coins based on their manner of sale, such that coins sold directly to institutional investors are considered securities and those sold through secondary market transactions to retail investors are not. In doing so, the Court rejects the approach recently adopted by another judge of this District in a similar case, *SEC v. Ripple Labs Inc.*, 2023 WL 4507900 (S.D.N.Y. July 13, 2023).

684 F. Supp. 3d at 197.

58.    Judge Rakoff went on to explain that *Howey* and its progeny never made such a distinction, nor does it matter, for purposes of *Howey* analysis, whether a purchaser "bought the coins directly from the defendants or, instead, in a secondary resale transaction." *Id.*

59.    The jury later found defendants liable for securities fraud relating to the tokens at issue in that case.

*U.S. Sec. & Exch. Comm'n v. Coinbase*

60.    In *U.S. Sec. & Exch. Comm'n v. Coinbase, Inc.*,[31] on June 6, 2023 the SEC charged Coinbase with "operating its crypto asset trading platform as an unregistered national securities exchange, broker, and clearing agency" and "failing to register the offer and sale of its crypto asset staking-as-a-service program." *See* 1:23-CV-04738 (S.D.N.Y.), Dkt. No. 1.

61.    Judge Katherine Polk Failla of the Southern District of New York denied the Coinbase defendants' motion for judgment on the pleadings with respect to all but one claim,

---

[30] https://web.archive.org/web/20241121150949/https://www.ft.com/content/5e5a3c4a-7508-4db8-ab23-1ff17c87c880.

[31] https://web.archive.org/web/20241121151112/https://www.sec.gov/newsroom/press-releases/2023-102.

finding "the SEC has sufficiently pleaded that Coinbase operates as an exchange, as a broker, and as a clearing agency under the federal securities laws, and, through its Staking Program, engages in the unregistered offer and sale of securities." *U.S. Sec. & Exch. Comm'n v. Coinbase, Inc.*, No. 23 CIV. 4738 (KPF), 2024 WL 1304037, at *35 (S.D.N.Y. Mar. 27, 2024).[32]

62.    Judge Failla also found that the SEC had pleaded "control person liability" for Coinbase Global. *Id.*

63.    While the SEC has apparently exercised its discretion and agreed to drop the case "as a policy matter," *see SEC v. Coinbase*, 23-cv-04738-KPF, Dkt. No. 178 (S.D.N.Y. Feb. 28, 2025) the move is highly unusual and likely to be viewed with suspect, given that a court has already denied defendants' motion to dismiss the action based on the federal securities laws.

*U.S. Sec. & Exch. Comm'n v. Payward Ventures, Inc. (Kraken)*

64.    In *U.S. Sec. & Exch. Comm'n v. Payward, Inc.*, on November 20, 2023 the SEC filed a complaint charging "Payward Inc. and Payward Ventures Inc., together known as Kraken, with operating Kraken's crypto trading platform as an unregistered securities exchange, broker, dealer, and clearing agency."[33]

65.    In a recent order by Judge William H. Orrick of the Northern District of California denying Kraken's motion to dismiss the SEC's Complaint, Judge Orrick found that the SEC plausibly alleged Kraken offered or sold crypto assets on Kraken as investment contracts, which were therefore plausibly alleged to be unregistered securities. *U.S. Sec. & Exch. Comm'n v. Payward, Inc.*, No. 23-CV-06003-WHO, 2024 WL 4511499 (N.D. Cal. Aug. 23, 2024), *motion to*

---

[32] The court only granted the motion as to the SEC's claim that Coinbase acted as an unregistered broker through its "Coinbase Wallet" service. 2024 WL 1304037, at *33.
[33] https://web.archive.org/web/20241122153934/https://www.sec.gov/enforcement-litigation/litigation-releases/lr-25896.

*certify appeal denied sub nom. SECURITIES AND EXCHANGE COMMISSION, Plaintiff, v. PAYWARD, INC., et al., Defendants. Additional Party Names: Kraken*, No. 23-CV-06003-WHO, 2024 WL 4819259 (N.D. Cal. Nov. 18, 2024).

66.     In doing so, the court rejected, as numerous other courts have, Kraken's argument that an investment contract requires a "formal contract" or "post-sale obligations" from the issuer to the purchaser who bought the token on a secondary marketplace, like Kraken. *Id*. at *8.

67.     The court was clear that investment contracts are not limited to formal contracts and that the *Howey* test applies regardless of whether that transaction is on a primary or secondary market. *Id*. at *8-*18.

68.     Further, the court found the SEC to have plausibly alleged vertical commonality, and thus common enterprise, because the promoters of some crypto assets on Kraken allegedly retain ownership or control over billions of the tokens they promote. *Id*. at *14-16.

*Donovan v. GMO-Z.COM Trust Company, Inc.*

69.     In *Donovan v. GMO-Z.COM Trust Company, Inc.*, plaintiffs alleged that a digital asset known as a stablecoin constituted an unregistered security. *See* 23-cv-08431-AT (S.D.N.Y).

70.     On February 17, 2025, the court held that plaintiffs had stated a claim under, *inter alia*, New York General Business Law ¶¶349 and 350 – the same claims brought here – finding that plaintiffs had alleged deceptive acts and practices and false advertising under New York state law, even while the court dismissed the federal law claims. *Donovan v. GMO-Z.COM Trust Company, Inc.*, 23-cv-08431-AT, Dkt. No. 121 (S.D.N.Y Feb. 17, 2025).

*Relevant Law Regarding Non-Fungible Tokens or NFTs*

71.     A non-fungible token is "a unique digital item stored on a blockchain. NFTs can

represent almost anything, and serve as a digital record of ownership."[34]

72.     The relevant caselaw extends to NFTs as well, as briefly discussed below.

*U.S. Sec. & Exch. Comm'n v. Stoner Cats 2 LLC*

73.     In *Stoner Cats*,[35] the SEC issued an order instituting cease-and-desist proceedings and making findings, and imposing a cease-and-desist order[36] on September 13, 2023 and eventually settled with Stoner Cats 2 LLC for conducting an unregistered offering of securities in the form of NFTs called Stoner Cats. In the press release announcing the charges against Stoner Cats 2 LLC (SC2), Gurbir S. Grewal, former Director of the SEC's Division of Enforcement, stated: "Regardless of whether your offering involves beavers, chinchillas or animal-based NFTs, under the federal securities laws, it's the economic reality of the offering – not the labels you put on it or the underlying objects – that guides the determination of what's an investment contract and therefore a security."[37]

74.     In the order, the SEC highlighted several aspects of the Stoner Cats offering that revealed that, applying the *Howey* test, "[I]nvestors in Stoner Cats NFTs had a reasonable expectation of obtaining a profit based on SC2's [the issuer] managerial and entrepreneurial efforts."[38]

75.     First, there was a secondary market for Stoner Cats holders to trade and profit off

---

[34] *See* https://web.archive.org/web/20240727172029/https://opensea.io/learn/nft/what-are-nfts.
[35] https://web.archive.org/web/20241121151708/https://www.sec.gov/newsroom/press-releases/2023-178.
[36] https://web.archive.org/web/20240904043245/https://www.sec.gov/files/litigation/admin/2023/33-11233.pdf.
[37] https://web.archive.org/web/20241121151708/https://www.sec.gov/newsroom/press-releases/2023-178.
[38] https://web.archive.org/web/20240904043245/https://www.sec.gov/files/litigation/admin/2023/33-11233.pdf.

of their NFTs. "In addition, at least 20% of the Stoner Cats NFTs purchased in the offering were resold in the secondary market before the first episode of the Stoner Cats series aired, two days after the offering, and the majority of the NFTs purchased in the offering were resold in the secondary market before the release of the second episode on November 15, 2021."[39]

76.    Second, Stoner Cat NFT "owners" did not actually control the intellectual property associated with Stoner Cats.[40] "While purchasers may 'own' their particular Stoner Cats NFT, SC2 specifically reserved all commercial rights to the underlying intellectual property, including the images of the characters. SC2 hired a contractor to write computer code that produced these unique images from animations created by the primary animator."[41]

77.    Third, secondary market re-sales of Stoner Cats generated royalties for Stoner Cats 2 LLC. The SEC alleged that "SC2 configured the Stoner Cats NFTs so that it received a 2.5% royalty for each transaction in them on a certain secondary market platform. The royalties created incentives for SC2 to encourage individuals to buy and sell the Stoner Cats NFTs in the secondary market."[42] As well as that "[p]rior to the offering, one of the programmers working for SC2 contacted a platform for trading NFTs to 'verify' the Stoner Cats NFT collection. Doing so ensured that SC2 would receive royalties from resale transactions and, importantly, assured purchasers in the secondary market that they were buying authentic Stoner Cats NFTs. This facilitated secondary market transactions in Stoner Cats NFTs."[43]

78.    Fourth, Stoner Cats 2 LLC used social media to promote the profit potential of

---

[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] *Id.*

Stoner Cats NFTs.[44]

*U.S. Sec. & Exch. Comm'n v. Impact Theory*

79.    In Impact Theory,[45] the SEC issued an order instituting cease-and-desist proceedings and making findings, and imposing a cease-and-desist order[46] on August 28, 2023, where the SEC charged, and subsequently settled with, Impact Theory, for conducting an unregistered offering of securities in the form of NFTs. The SEC alleged that the three tiers of NFTs offered and sold by the company, known as KeyNFTs, were unregistered investment contracts, per *Howey*. Therefore, the SEC alleged that "purchasers in the KeyNFT offering had a reasonable expectation of obtaining a future profit based on Impact Theory's managerial and entrepreneurial efforts."[47]

80.    Among other factors, the SEC noted that investors could realize their profit from selling their NFTs on the secondary market. KeyNFTs could be traded on secondary trading platforms and the company promoted this fact. "Impact Theory stated on its websites and social media channels that KeyNFTs could be purchased and sold on two such secondary market platforms. Impact Theory programmed the smart contract for the KeyNFTs so that the company received a 10% 'royalty' on each secondary market sale."[48]

---

[44] https://web.archive.org/web/20240904043245/https://www.sec.gov/files/litigation/admin/2023/33-11233.pdf.

[45] https://web.archive.org/web/20241121152314/https://www.sec.gov/newsroom/press-releases/2023-163.

[46] https://web.archive.org/web/20241001101957/https://www.sec.gov/files/litigation/admin/2023/33-11226.pdf.

[47] *Id.*

[48] *Id.*

*Dufoe v. DraftKings, Inc.*

81.     In *Dufoe v. Draftkings, Inc et al*., a proposed class action currently proceeding in the District of Massachusetts, the plaintiff alleged that DraftKings violated federal securities law by selling unregistered securities in the form of NFTs on the DraftKings Marketplace. 23-CV-10524-DJC (D. Mass.).

82.     On July 2, 2024, Judge Denise J. Casper denied defendants' motion to dismiss. Judge Casper found that the plaintiff had "plausibly pled that DraftKings NFTs were investment contracts, and thus securities within the meaning of the Securities Act and Exchange Act." *Dufoe v. DraftKings Inc*., 23-CV-10524-DJC, 2024 WL 3278637, at *10 (D. Mass. July 2, 2024.

83.     Judge Casper found that plaintiff had sufficiently alleged horizontal commonality, therefore satisfying the common enterprise prong of *Howey*, because pooling occurred when the "revenue generated by the sale of NFTs was reinvested into DraftKings' business, including through promotion of the Marketplace." *Id*. at *4-6.

84.     In this way, Judge Casper followed the holding in *Friel v. Dapper Labs, Inc*., 657 F. Supp. 3d 422 (S.D.N.Y. 2023), a similar case that, at the pleading stage, also found the NFTs at issue to constitute securities under the *Howey* test.

85.     Next, the court in *DraftKings* found that plaintiff had plausibly alleged the reasonable expectation of profits from his NFT purchase through the theory of capital appreciation in that "the value of existing NFTs is driven upwards if DraftKings maintains investor interest and demand in the Marketplace." *Id*. at *7-9.

86.     Finally, the court found that plaintiff had plausibly alleged that the profits were expected solely from the efforts of others because the NFTs values were dependent on the success of the DraftKings Marketplace, even though the NFTs were not minted on DraftKing's proprietary

blockchain. *Id.* at *9-10.

*Harper v. O'Neal*

87.    In *Harper v. O'Neal*, the plaintiff filed a class action suit in the Southern District of Florida, against Shaquille O'Neal, Astrals LLC, Astrals Holding, LLC, and Astrals Operations LLC for their promotion, offer, and sale of unregistered securities in the form of Astrals NFTs and Galaxy tokens created by the Astrals project. 1:23-cv-21912 (S.D. Fla.).

88.    On August 16, 2024, Judge Federico A. Moreno denied defendants' motion to dismiss claims that the Astrals NFTs constituted securities under the *Howey* test and applicable securities law and that Defendant O'Neal was a statutory seller engaged in the solicitation of sales of those unregistered securities. *Harper v. O'Neal*, 23-21912-CIV, 2024 WL 3845444 (S.D. Fla. Aug. 16, 2024).

## THE NFTS ARE UNREGISTERED SECURITIES

89.    Under the *Howey* Test, an investment contract is a security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others.

90.    Applying the *Howey* Test to The NFTs reveals they qualify as securities:

**1.   Investment of Money**

91.    As the SEC states in its Framework (the "Framework")[49]: "The first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of traditional (or fiat)

---

[49] https://web.archive.org/web/20241121144150/https://www.sec.gov/about/divisions-offices/division-corporation-finance/framework-investment-contract-analysis-digital-assets.

currency, another digital asset, or other type of consideration."

92.     Investors purchasing NFTs on OpenSea made an investment of money or other valuable consideration for the purposes of the *Howey* Test.

### 2. Common Enterprise

93.     The SEC Framework states: "In evaluating digital assets, we have found that a 'common enterprise' typically exists." This is "because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."

94.     This is true of The NFTs investors. Investors who buy NFTs on OpenSea are passive participants in the enterprise, with the profits of each investor intertwined with the fate of the project. The fortunes of The NFTs investors, and the value of The NFTs, are linked almost entirely to the success of the creator's promotional efforts and development of The NFT project or enterprise. Accordingly, when investors purchase The NFTs on OpenSea, they participate in a common enterprise.

### 3. Expectation of Profit

95.     In terms of "reasonable expectations of profits," the SEC Framework states: "A purchaser may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market."[50]

96.     In particular, the SEC's Framework identifies several factors to help assess whether the "reasonable expectation of profits" element is met:

> The more the following characteristics are present, the more likely it is that there is a reasonable expectation of profit.
> 1. The digital asset gives the holder rights to share in the enterprise's income or profits or to realize gain from capital appreciation of the digital asset.
> > a. The opportunity may result from appreciation in the value of the digital asset that comes, at least in part, from the operation, promotion,

---

[50] *Id.*

improvement, or other positive developments in the
network, particularly if there is a secondary trading market that enables
digital asset holders to resell their digital assets and realize gains.
b. This also can be the case where the digital asset gives the holder rights to
dividends or distributions.
2. The digital asset is transferable or traded on or through a secondary market or
platform, or is expected to be in the future.
3. Purchasers reasonably would expect that an AP's [Active Participant, or
promoter] efforts will result in capital appreciation of the digital asset and therefore
be able to earn a return on their purchase.
4. The digital asset is offered broadly to potential purchasers as compared to being
targeted to expected users of the goods or services or those who have a need for the
functionality of the network.[51]

97.     Investors in The NFTs are clearly expecting to profit through the appreciation of

their digital assets that could be sold and traded through OpenSea, because investors expected the

price of their asset to increase and result in an increased return on their purchase, where they could

then resell them, peer-to-peer, on the OpenSea platform.

### 4. Derived from the Efforts of Others

98.     The SEC Framework provides that:

The inquiry into whether a purchaser is relying on the efforts of others focuses on
two key issues: Does the purchaser reasonably expect to rely on the efforts of an
[Active Participant]? Are those efforts 'the undeniably significant ones, those
essential managerial efforts which affect the failure or success of the enterprise,' as
opposed to efforts that are more ministerial in nature?
Although no one of the following characteristics is necessarily determinative, the
stronger their presence, the more likely it is that a purchaser of a digital asset is
relying on the "efforts of others":
1. An AP is responsible for the development, improvement (or enhancement),
operation, or promotion of the network, particularly if purchasers of the digital asset
expect an AP to be performing or overseeing tasks that are necessary for the
network or digital asset to achieve or retain its intended purpose or functionality.
a. Where the network or the digital asset is still in development and the
network or digital asset is not fully functional at the time of the offer or sale,
purchasers would reasonably expect an AP to further develop the
functionality of the network or digital asset (directly or indirectly). This
particularly would be the case where an AP promises further developmental
efforts in order for the digital asset to attain or grow in value.

---

[51] *Id.*

2. There are essential tasks or responsibilities performed and expected to be performed by an AP, rather than an unaffiliated, dispersed community of network users (commonly known as a "decentralized" network).

3. An AP creates or supports a market for, or the price of, the digital asset. This can include, for example, an AP that:

> (1) controls the creation and issuance of the digital asset; or
>
> (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, "burning," or other activities.

4. An AP has a lead or central role in the direction of the ongoing development of the network or the digital asset. In particular, an AP plays a lead or central role in deciding governance issues, code updates, or how third parties participate in the validation of transactions that occur with respect to the digital asset.

An AP has a continuing managerial role in making decisions about or exercising judgment concerning the network …[52]

99.     Purchasers of The NFTs on OpenSea are entirely reliant on the managerial efforts of others for their potential profits. Indeed, The NFTs' ability to maintain value depends significantly on OpenSea's reputation and promotional activities, as well as the efforts, reputation and promotional activities of The NFT project creators to lead the development of The NFTs. This is due to the centralized nature of OpenSea. It is unlike an investment in Bitcoin, for example, which is decentralized and run by no specific persons or entity.

100.     The NFTs offered on OpenSea were and are therefore "securities" as defined by the securities laws and as interpreted by relevant authorities including the Supreme Court, the federal courts, and the SEC.

## RELEVANT FACTUAL ALLEGATIONS

101.     In 2017, Defendants Finzer and Atallah launched the marketplace, OpenSea, an exchange with "tools that allow consumers to trade their items freely, creators to launch new digital works, and developers to build rich, integrated marketplaces for their digital items."[53]

---

[52] *Id.*

[53] https://web.archive.org/web/20241116065358/https://opensea.io/about.

102.     OpenSea is accessible throughout the world and has sold The NFTs worldwide, including in the United States and in New York.

103.     The OpenSea marketplace's monthly active user count varied widely, but reached an all-time high of 711,507 users for January 2022.[54]

104.     In January 2022, OpenSea reached 5,203,092 NFTs sold, an all-time high number, which generated OpenSea $123,114,953.65 of fees, also an all-time high.[55]

105.     OpenSea facilitates the primary sale of The NFTs through features like OpenSea Studio tools[56] or smart contract deployment.[57]

106.     OpenSea facilitates the secondary sale of NFTs through the "Buy now," "Offers," and "Auctions" options.[58]

107.     The OpenSea marketplace receives a 2.5% fee on secondary sales and between a 2.5% and 10% fee on mints. If the listing or offer was created using OpenSea Pro, then OpenSea receives a 0.5% fee.[59] Thus, when prices of the NFTs trading on the secondary market increase, the fees that OpenSea receives increase as well. These fees incentivize OpenSea to encourage individuals to trade actively on OpenSea's secondary market.

108.     OpenSea claims to moderate and curate The NFTs listed for sale on its exchange, purporting to screen unregistered securities from its offerings. But despite these assurances,

---

[54] *See* https://web.archive.org/web/20241115231634/https://dune.com/rchen8/opensea; https://dune.com/rchen8/opensea.
[55] *Id*.
[56] https://web.archive.org/web/20241121153609/https://support.opensea.io/en/articles/8867023-how-do-i-create-an-nft.
[57] https://web.archive.org/web/20241121153806/https://support.opensea.io/en/articles/8867045-part-1-deploy-a-smart-contract.
[58] https://web.archive.org/web/20241025191454/https://opensea.io/learn/nft/how-to-buy-nft.
[59] https://web.archive.org/web/20241121154152/https://support.opensea.io/en/articles/8867091-what-fees-do-i-pay-on-opensea.

Plaintiff purchased unregistered securities on OpenSea.

109.    Akin to crypto assets on other platforms, The NFTs are securities, despite being unregistered with the SEC.

110.    In their role as influential ringleaders in the NFT space, Defendants continue to give false hope to unsuspecting investors by promoting and advertising the unregistered securities.

111.    Plaintiff purchased and still holds various of The NFTs. Plaintiff's NFTs are and were unregistered securities and are accordingly devoid of the value Plaintiff thought they had.

112.    On the other hand, Defendants and OpenSea have experienced great success. OpenSea has been described as having "plenty of runway" with respect to its financial success at least as recently as in August 2024.[60] Indeed, in March 2021, OpenSea's revenue increased from $9 million in the second quarter of 2021 to $186 million in the fourth quarter of 2021.[61] In November 2023, "[i]t had $438 million in cash and $45 million in crypto reserves".[62] Reflecting on the boom times, a former employee explained that "everybody saw a chance to become filthy rich" and that "celebrities [were] coming out of the woodwork, the cash grabs, [they were] just really exciting."[63]

---

[60] https://web.archive.org/web/20241121154537/https://www.theverge.com/24161573/opensea-crypto-nfts-workplace-rise-fall.
[61] *Id.*
[62] *Id.*
[63] *Id.*

**DEFENDANTS USE THEIR OWN TWITTER ACCOUNTS TO HYPE THE NFTS FOR YEARS, MISLEADINGLY OMITTING THAT THE NFTS ARE ACTUALLY UNREGISTERED SECURITIES**

113.    On June 13, 2018, Defendant Finzer tweeted the following:



https://x.com/dfinzer/status/1006995530080313345.

114.    Defendant Finzer's tweet, touting "greater liquidity and price discovery of crypto assets," and implying that it is now easier than ever to place bids on OpenSea, was designed to make people buy unregistered securities. The tweet was materially misleading because it omitted that the NFTs are unregistered securities.

115.    At some point in the recent past, it appears that Defendant Finzer altered the settings on his twitter account so that the word "opensea" appears next to "dfinzer.eth," as seen above. However, on information and belief, this is a recent change and does not reflect how Defendant Finzer's tweets appeared at the time they were written and published. Rather, Defendant Finzer's tweets appeared as being from "Devin Finzer," as illustrated by this representative tweet taken from an archived version of Defendant Finzer's twitter page:





116.    On July 17, 2018, Defendant Finzer tweeted the following:



https://x.com/dfinzer/status/1019370841706917888.

117.    Defendant Finzer's tweet was designed to make people buy unregistered securities. By referencing "higher degrees of liquidity, algorithmic market-making, and new trading mechanisms," the tweet appealed to traders seeking to profit. There is no reason other than profit that someone would be interested in these features. The tweet was materially misleading because it omitted that the NFTs are unregistered securities.

118.    On August 6, 2018, Defendant Finzer tweeted the following:



https://x.com/dfinzer/status/1026532347435466752

119.    Defendant Finzer's tweet was designed to make people buy unregistered securities. Touting the "giant liquidity pool" and using the stock-market-going-up emoji beckoned traders and signaled that investors could make money trading NFTs on OpenSea. The tweet was materially misleading because it omitted that the NFTs are unregistered securities.

120.    On October 2, 2018, Defendant Finzer tweeted the following:



https://x.com/dfinzer/status/1047133679800266752.

121.    Defendant Finzer's tweet was designed to make people buy unregistered securities. By telling people to download several "cryptogoods" and sell them as a bundle on the open market, Defendant Finzer was telling investors how they could make money by transacting on OpenSea. The tweet was materially misleading because it omitted that the NFTs are unregistered securities.

122.    On May 8, 2019, Defendant Finzer tweeted the following:



https://x.com/dfinzer/status/1126221254263025665.

123.    Defendant Finzer's tweet was designed to make people buy unregistered securities. The tweet urges people to buy NFTs at "lower prices," so they can then be resold at higher prices. The tweet was materially misleading because it omitted that NFTs sold on OpenSea are unregistered securities.

124.    On May 3, 2020, Defendant Finzer tweeted the following:



https://x.com/dfinzer/status/1235061647158337536.

125.    Defendant Finzer's tweet was designed to make people buy unregistered securities. By touting secondary sales on OpenSea, the tweet appealed to traders seeking to profit, and it was materially misleading because it omitted that the NFTs are unregistered securities.

126.    On May 29, 2020, Defendant Atallah tweeted the following:



https://x.com/xanderatallah/status/1266396598151479296.

127.    Defendant Atallah's tweet was designed to make people buy unregistered securities.  By touting secondary sales and writing that "[w]e'll make sure the economy stays healthy," the tweet sent the message that transacting on OpenSea was safe and legal, however, the NFTs on OpenSea were unregistered securities.

128.    On July 28, 2020 Defendant Atallah tweeted the following:



https://x.com/xanderatallah/status/1288185910941691904.

129.    Defendant Atallah's tweet was designed to make people buy unregistered securities, by touting secondary sales, high prices, and using the flying-money emoji. The tweet was materially misleading because it omitted that the NFTs on OpenSea were unregistered securities.

130.    On August 17, 2020, Defendant Finzer tweeted the following:



https://x.com/dfinzer/status/1295374834126319617.

131.    Defendant Finzer's tweet was designed to build hype and excitement around the NFTs offered on OpenSea, by referencing "fomo," as in, "fear of missing out" on an opportunity. The tweet was materially misleading because it omitted that the NFTs offered on OpenSea are unregistered securities.

132.    On August 27, 2020, Defendant Atallah tweeted the following:



https://x.com/xanderatallah/status/1299037252732039178.

133.    Defendant Atallah's tweet was designed to make people buy unregistered securities. By proclaiming that crypto is making art a viable career path for the digital age, the tweet was misleading because it portrayed NFTs on OpenSea as works of art and not unregistered securities.

134.    On August 30, 2020, Defendant Atallah tweeted the following:



https://x.com/xanderatallah/status/1300085878459691011.

135.    Defendant Atallah's tweet was designed to make people buy unregistered securities. The tweet touted the explosive growth in secondary market transactions on OpenSea, while omitting that the NFTs sold on OpenSea are unregistered securities.

136.    On September 13, 2020, Defendant Finzer tweeted the following:



https://x.com/dfinzer/status/1305203985930792960.

137.    Defendant Finzer's tweet was designed to make people buy unregistered securities. By proclaiming that "[d]igital art is becoming a real investment opportunity," and praising the re-sale market for NFTs, the tweet appealed to traders and speculators seeking to profit, and omitted to disclose that the NFTs on OpenSea are unregistered securities.

138.    Also on September 13, 2020, Defendant Finzer tweeted the following:



https://x.com/dfinzer/status/1305203994499756034.

139. Defendant Finzer's tweet was designed to make people buy unregistered securities. By touting the soaring secondary market for NFTs on OpenSea, but omitting to disclose that OpenSea sells unregistered securities, the tweet was materially misleading.

140. On September 27, 2020, Defendant Atallah tweeted the following:



https://x.com/xanderatallah/status/1310317679052558337.

141.     Defendant Atallah's tweet was designed to make people buy unregistered securities. By touting digital art on the grounds that "[a]nyone can bid on it & update the market value," with the use of the money stack emoji, the tweet promoted the instantly liquid nature of these crypto assets and aimed to attract investors seeking a profit, while omitting to disclose that the NFTs sold on OpenSea are unregistered securities.

142.     On September 28, 2020, Defendant Atallah tweeted the following:



https://x.com/xanderatallah/status/1310565244083884032.

143. Defendant Atallah's tweet was designed to make people buy unregistered securities. By assuring people that digital art is something people want, the tweet touted the secondary market opportunities on OpenSea, without disclosing that the NFTs on OpenSea are unregistered securities.

144. On January 1, 2021, Defendant Finzer tweeted the following:



https://x.com/dfinzer/status/1344874268639813632.

145. Defendant Finzer's tweet was designed to build buzz and hype around the NFTs on OpenSea and attract investors, but failed to disclose that the NFTs on OpenSea are unregistered securities.

146. On January 6, 2021, Defendant Atallah tweeted the following:



https://x.com/xanderatallah/status/1346881857598726149.

147.    Defendant Atallah's tweet was designed to make people buy unregistered securities. By implying that "selling rare digital art is now the easiest way to own a business," Defendant Atallah sought to attract investment and buzz for the NFT market on OpenSea, but failed to disclose that the NFTs are unregistered securities.

148.    On February 11, 2021, Defendant Finzer tweeted the following:



https://x.com/dfinzer/status/1359754077698146310.

149.    By linking prediction markets and NFT markets, Defendant Finzer's tweet was designed to portray the markets for NFTs as a way for investors to place bets and make quick profits.

150.    On February 19, 2021, Defendant Finzer tweeted the following:



https://x.com/dfinzer/status/1362760598732345345.

151.    Defendant Finzer's tweet was designed to make people buy unregistered securities. By touting a new bridge that enables trading NFTs on Uniswap and using the rocket ship emoji, which connotes the price of something going to the moon, the tweet sought to further build the market for NFTs on OpenSea, without disclosing that the NFTs are unregistered securities.

152.    On March 18, 2021, Defendant Finzer tweeted the following:



https://x.com/dfinzer/status/1372571407893336066.

153.  Defendant Finzer's tweet was designed to make people buy unregistered securities. By touting OpenSea's recent raise of $23 million in funds "to scale the largest marketplace for NFTs," the tweet sought to build excitement and buzz around the NFTS on OpenSea, without disclosing that the NFTs are unregistered securities.

154.  On March 28, 2021, Defendant Atallah tweeted the following:



https://x.com/xanderatallah/status/1376259409710579712.

155.    Defendant Atallah's tweet was designed to make people buy unregistered securities. By encouraging people to create an NFT collection so that they are rewarded when the NFTs get traded up, using the stock market going up emoji, the tweet reinforced the idea that the secondary market for NFTs is a lucrative opportunity. The tweet was materially misleading because it failed to disclose that the NFTs are unregistered securities.

156.    On March 31, 2021, Defendant Finzer tweeted the following:



https://x.com/dfinzer/status/1377331785676193792.

157.    Defendant Finzer's tweet was designed to build buzz and hype around the market for NFTs on OpenSea, however, the tweet was misleading because it did not disclose that the NFTs are unregistered securities.

158.    On April 26, 2021, Defendant Atallah tweeted the following:



https://x.com/xanderatallah/status/138666061784351l296.

159.    Defendant Atallah's tweet was designed to make people buy unregistered securities. By touting the success of secondary sales of NFTs on OpenSea, the tweet sent the message that the secondary market for NFTs is exploding, while not disclosing that the NFTs are unregistered securities.

160.    On June 25, 2021, Defendant Atallah tweeted the following:



https://x.com/xanderatallah/status/1408498767481950216.

161.    Defendant Atallah's tweet was designed to make people buy unregistered securities. By pronouncing that "NFTs are the new internet," and asking for help in growing the world's first and largest NFT platform, the tweet sent the message that NFTs are the defining technological innovation of our time and so the tech-savvy should jump into this growing market while they can, however, the tweet did not disclose that the NFTs are unregistered securities.

162.    On July 20, 2021, Defendant Finzer tweeted the following:



https://x.com/dfinzer/status/1417471326424547352.

163.    Defendant Finzer's tweet was designed to make people buy unregistered securities. By proclaiming that "OpenSea is a foundational layer for a giant paradigm shift" and announcing that OpenSea has raised an additional $100 million to grow the world's best NFT marketplace, the tweet sent the message that the market for NFTs on OpenSea is enormous and still growing, however, the tweet did not disclose that the NFTs are unregistered securities.

164.    On July 29, 2021, Defendant Finzer tweeted the following:



https://x.com/dfinzer/status/1420756498402119680.

165.    Defendant Finzer's tweet was designed to build hype and excitement around NFTs,

by urging that the current calendar year was all about making the NFT into something that people just need to have.

166.    On August 1, 2021, Defendant Finzer tweeted the following:



https://x.com/dfinzer/status/1422016457290956800.

167.    Defendant Finzer's tweet was designed to grow the burgeoning secondary market for NFTs on OpenSea. By touting that transaction volume over the past two days was several times greater than transaction volume in all of the prior year, and stating that "[t]he growth curve for NFTs is insane," Defendant Finzer was sending the message that the market will continue to explode and present more opportunities to profit by trading in NFTs on OpenSea, however, the tweet did not disclose that the NFTs are unregistered securities.

168.    On August 16, 2021, Defendant Finzer tweeted the following:



https://x.com/dfinzer/status/1427429707365163009.

169.    Defendant Finzer's tweet was designed to make people buy unregistered securities. By touting that OpenSea just hit $1 billion in trading volume for the month of August alone, and that "it's still day 0 for NFTs," the message was clear: NFTs are an exploding market, and the time to get in is now. However, the tweet was materially misleading because it did not disclose that the NFTs are unregistered securities.

170.    Also on August 16, 2021, Defendant Atallah tweeted the following:



https://x.com/xanderatallah/status/1427453596858294272.

171.    Defendant Atallah's tweet was designed to make people buy unregistered securities. By touting that OpenSea has passed Etsy in volume – with $1 billion in August alone – and that NFTs are rapidly catching up to all of eBay, the tweet urged investors to get in while the market is still experiencing exponential growth. However, the tweet was misleading because it did not disclose that the NFTs are unregistered securities.

172.    On August 23, 2021, Defendant Atallah tweeted the following:



https://x.com/xanderatallah/status/1429965480769605637.

173.    Defendant Atallah's tweet was designed to make people buy unregistered securities. By touting that OpenSea has had three records days in a row, with $195 million in volume that day alone, the tweet urged investors to jump in and take advantage of the NFT craze. However, the tweet did not disclose that the NFTs are unregistered securities.

174.    On January 4, 2022, Defendant Atallah tweeted the following:



https://x.com/xanderatallah/status/1478558895614296064.

175.    Defendant Atallah's tweet was designed to make people buy unregistered

49

securities. By touting that "NFTs are the beginning of a new internet," and writing that "[s]o far it's been a fast-growing community of early adopters," the tweet portrayed the NFT market as a giant in its early stages, signaling that now is the time to get in, however, the tweet did not disclose that the NFTs are unregistered securities.

176.    Also on January 4, 2022, Defendant Finzer tweeted the following:



https://x.com/dfinzer/status/1478567839871082496.

177.    Defendant Finzer's tweet was designed to make people buy unregistered securities. By teasing that, "[i]f you thought 2021 was the 'year of the NFT', 2022 is going to blow your mind," the tweet implied that the growth in the NFT market in the upcoming year will be even greater than the prior year, however, the tweet did not disclose that the NFTs are unregistered securities.

178.    On June 14, 2022, Defendant Finzer tweeted the following:



https://x.com/dfinzer/status/1536771703249858561.

179.    Defendant Finzer's tweet was designed to make people buy unregistered securities. By touting that OpenSea provides "additional data, like attribute floor price and % rarity," the tweet explained how OpenSea enables traders to profit. There is no other reason that NFT buyers would be interested in floor price, other than to make a profit. The tweet was materially misleading because it did not disclose that the NFTs are unregistered securities.

180.    On September 13, 2022, Defendant Finzer tweeted the following:



https://x.com/dfinzer/status/1569706495167860739.

181.    Defendant Finzer's tweet was designed to make people buy unregistered securities. By insisting that the NFT market will rebound and overcome "temporary fluctuations in volume,"

the tweet told investors to stay the course and continue to participate in the market for NFTs, however, the tweet did not disclose that the NFTs are unregistered securities.

182.    Also on September 13, 2022, Defendant Finzer tweeted the following:



https://x.com/dfinzer/status/1569706499970334720.

183.    Defendant Finzer's tweet was designed to make people buy unregistered securities. By insisting that "we're staying patient, and we don't mind the dip(s)," the tweet sent the message that the NFT market would rebound and deliver profits once again. The tweet was materially misleading because it did not disclose that the NFTs are unregistered securities.

184.    On November 30, 2022, Defendant Atallah tweeted the following



https://x.com/xanderatallah/status/1597998353400631298.

185.    Defendant Atallah's tweet was designed to make people buy unregistered securities. By stating that "NFTs are the easiest way to own your own business" and touting that creators have earned $1 billion in fees this year, the tweet sent the message that the market, including the secondary market, for NFTs is growing and will continue to do so. The tweet was materially misleading because it did not disclose that the NFTs are unregistered securities.

186.    On April 8, 2023, Defendant Atallah tweeted the following:



53

https://x.com/xanderatallah/status/1644568853475651584.

187.    Defendant Atallah's tweet was designed to make people buy unregistered securities. By touting a feature that allows NFT traders to discover which of their "NFTs is valued closest to the floor" and then list those NFTs for sale, the tweet aimed to explain how NFT traders could turn a profit. The tweet was materially misleading because it failed to disclose that the NFTs are unregistered securities.

188.    On May 31, 2023, Defendant Finzer tweeted the following:



https://x.com/dfinzer/status/1664053130571522056.

189.    Defendant Finzer's tweet was designed to make people buy unregistered securities. By touting that "[r]edeemable NFTs are one of the most promising areas of our space right now, but we need to push them to the next level," the tweet sent the message that redeemable NFTs are another high growth area in which NFT traders can profit. However, the tweet was materially misleading because it failed to disclose that the NFTs are unregistered securities.

190.    On January 22, 2024, Defendant Finzer tweeted the following:



https://x.com/dfinzer/status/1749484773314085134.

191.    Defendant Finzer's tweet was designed to make people buy unregistered securities. By touting "on-chain interoperability, instant secondary marketplaces, lending, [and] fractionalization," in regard to physical-backed NFTs, the tweet aimed to hype these features that enable NFT traders to profit. The tweet was materially misleading because it did not disclose that the NFTs are unregistered securities.

### AFTER MUCH INVESTIGATION, THE SEC ISSUES OPENSEA A WELLS NOTICE, WHICH DEFENDANT FINZER PUBLICIZES, REVEALING THAT THE NFTS ARE UNREGISTERED SECURITIES

192.    When the SEC launched its first enforcement action in the NFT industry against the NFT project Impact Theory in late August of 2023 and weeks later against Stoner Cats 2 LLC in September of 2023, the SEC also issued third-party subpoenas to OpenSea.[64] Moreover, "OpenSea also had a line attorney from the agency assigned to its 'case' and was engaged in

---

[64] https://web.archive.org/web/20241121154537/https://www.theverge.com/24161573/opensea-crypto-nfts-workplace-rise-fall.

'custodial document production' with the agency, per internal company documents."[65]

193.    OpenSea's spokesperson, Joshua Galper, confirmed the SEC requests and stated that these SEC requests had been occurring since 2022.[66]

194.    Further, according to an article in *The Verge*, OpenSea issued a vocabulary guide instructing employees on terminology when either talking to each other or the public when discussing NFTs and OpenSea.[67] "Instead of saying 'buy, sell, or pay on OpenSea,' legal counsel told employees to say, 'purchase on the blockchain,' 'purchase using MoonPay' (a crypto payments company), or 'buy using OpenSea.' The guide said, 'This distinction is very important to keep clear, as it impacts our tax and legal obligations.'"[68]

195.    The illegality of the OpenSea marketplace came to light only recently, however, as seen by the Wells Notice that the SEC has issued to OpenSea.[69]

196.    Defendant Finzer tweeted news of the Wells Notice, in the following defiant tweet on August 28, 2024:

---

[65] *Id*.

[66] *Id*.

[67] *Id*.

[68] *Id*.

[69] https://web.archive.org/web/20241003095431/https://opensea.io/blog/articles/taking-a-stand-for-a-better-internet.



← **Post**    Reply    ⇄

**dfinzer.eth | opensea** ✓ 🅱    𝕏 ⋯
@dfinzer

OpenSea has received a Wells notice from the SEC threatening to sue us because they believe NFTs on our platform are securities.

We're shocked the SEC would make such a sweeping move against creators and artists. But we're ready to stand up and fight.

Cryptocurrencies have long been in the crosshairs of the SEC, and companies like @coinbase, @Uniswap, @RobinhoodApp, @krakenfx, and @Consensys have been fighting against the SEC's single-track approach of "regulation by enforcement."

But this is a move into uncharted territory. By targeting NFTs, the SEC would stifle innovation on an even broader scale: hundreds of thousands of online artists and creatives are at risk, and many do not have the resources to defend themselves.

NFTs are fundamentally creative goods: art, collectibles, video game items, domain names, event tickets, and more.

We should not regulate digital art in the same way we regulate collateralized debt obligations.

As we've built OpenSea, we've heard so many stories about the impact of NFTs on people's lives, including:

- Student artists finding full-time careers in selling their digital art
- Indie game developers instantly enabling open markets for their in-game items, without having to build marketplaces from scratch
- Passionate collectors from different corners of the world joining new communities, all centered around shared digital ownership

It would be a terrible outcome if creators stopped making digital art because of regulatory saber-rattling. Take, for example, the suit filed against the SEC by the musician @songadaymann and conceptual artist @brianlfrye, which describes their fear that the sale of their art and music could be deemed unregistered securities offerings.

In addition to standing our own ground, we're pledging $5M to help cover legal fees for NFT creators and devs that receive a Wells notice. Every creator, big or small, should be able to innovate without fear.

I hope the SEC will come to its senses sooner rather than later, and that they'll listen with an open mind.

Until then, we'll stand up and fight for our industry.

Onwards 

9:48 AM · Aug 28, 2024 · **5.7M** Views

https://x.com/dfinzer/status/1828791832009953706.

197.    Just like in his myriad earlier tweets, Defendant Finzer failed to mention how the NFTs are sold as investments in the entrepreneurial and managerial efforts of others, and are therefore securities under the law.[70]

198.    Failing to take accountability for facilitating the exchange of unregistered securities, Defendant Finzer instead continues to promote the sale of such securities to unsuspecting investors.

199.    Following the announcement of the Wells Notice, the value of the NFTs that Defendants have been hyping up for years plummeted, injuring Plaintiff and other members of the

---

[70] *See Id.*

Class.

200.    Even if the SEC takes the unusual step of dropping its enforcement action after issuing the Wells Notice, as Defendant Finzer claimed is the case in a February 2025 twitter post, the NFTs are now tainted and worth substantially less money because, following a multi-year SEC investigation, the market has become aware of the securities law violations occurring at OpenSea.

**EVEN IF THE COURT DOES NOT FIND THAT ALL NFTS SOLD ON OPENSEA ARE SECURITIES, DEFENDANTS KNEW FOR YEARS THAT SECURITIES LAW VIOLATIONS WERE RAMPANT ON OPENSEA**

201.    Defendants' statements were materially misleading even if the Court does not find that the NFTs sold on OpenSea are, as a class of crypto asset, securities.

202.    This is because, unlike Plaintiff and others who bought NFTs during the relevant period, Defendants knew that securities law violations at OpenSea were rampant and that OpenSea's terms of service purporting to prevent securities from being offered on the platform were being widely ignored, but Defendants continued to hype the NFTs to unsuspecting investors anyway.

203.    As reported in a recent news article: "OpenSea, one of the largest global marketplaces for NFTs, has taken actions that suggest it has been aware for years that some NFT collections listed on its site are more than just art, according to three former employees of OpenSea, as well as company documents seen by *DL News*." *See* https://www.dlnews.com/articles/regulation/opensea-axed-nfts-that-acted-like-securities-before-sec-news/.

204.    In addition to maintaining the specialized vocabulary guide so as not to appear to be violating the securities laws, the *DL News* article reported: "OpenSea has regularly delisted or disabled non-fungible tokens, or NFTs, that may behave like financial instruments. It has targeted

'anything which promised returns, had a token, or could be construed as a security in any way,' a person familiar with the practice told *DL News.*"

205.    But while OpenSea appears to have an official policy of curating its NFTs and screening for NFTs that involve the most blatant securities law violations in that they, for instance, entitle owners to be rewarded in cryptocurrency or "that are redeemable for financial instruments or that give owners rights to participate in an ICO or any securities offering," OpenSea's policy is an empty gesture.

206.    The article continues:

It fell to OpenSea's Trust and Safety compliance team to police the huge volume of content hitting the site day in and day out. The NFT marketplace's legal and moderation teams were 'dedicated beyond belief' and used computer programmes to sift through the flood of content hitting the site, said one former staffer. "But if you're ingesting every NFT on many blockchains, it's just whack-a-mole," they said…

And it wasn't always easy to parse whether a user was buying an NFT for the art or for its promised rewards, said another ex-staffer. (The three former employees asked not to be named because they were not authorised to speak publicly about OpenSea's internal policies.)

207.    While several of the NFTs that OpenSea sold on its platform had been sued by the SEC for securities law violations, OpenSea at least maintained the public façade that it was complying with the securities laws, until the Wells Notice revealed what Defendants had known for years: that securities law violations at OpenSea were widespread, tainting the platform's assets and injuring the investors that own them.

## EMBOLDENED BY PURPORTED PRO-CRYPTO DEVELOPMENTS IN THE NEWS, DEFENDANT FINZER DOUBLES DOWN AND LEADS OPENSEA DOWN A PATH OF COMMITTING EVEN MORE BLATANT SECURITIES LAW VIOLATIONS, FURTHER DAMAGING HOLDERS OF THE NFTS

208.    Around the same time that Defendant Finzer took to twitter to claim that the SEC is dropping its enforcement action against OpenSea, Defendant Finzer announced "OS2," or

"OpenSea 2.0" a major re-boot of OpenSea:



← **Post**                                    Reply  ⇄

📌 **Pinned**
**dfinzer.eth | opensea** ✔️ 📷
@dfinzer

A lot is changing at @opensea:

• We're rolling out OS2 — a brand new OpenSea built from the ground up. NFTs 🪙 tokens.
• $SEA is coming from @openseafdn
• We're changing policies that didn't make sense for web3: re-enabling locked items and delisted collections, and removing unnecessary bans
• We're launching with 0.5% platform fees for NFTs, plus 0% for tokens

OS2 isn't just a new product, and $SEA isn't just a token. This is about a new OpenSea.

The NFT bull market changed us. We got too corporate, too web2, and let fear of risk outweigh building for users.

I decided we needed a complete reset. So we went heads down and started rebuilding: tech, product, and most importantly — culture. Fixing those foundations has been a lot of blood, sweat, and tears. But it's been incredible to see the team transform.

The private beta testers know OS2 feels different. Our devs in Discord fixing user issues at 3am during the holidays. A smaller, crypto-native team, merging 6x the commits with half the team size. There's that early-day energy where we're all in it together.

With $SEA, the @openseafdn is taking the learnings from the space and getting it right. Not just recent activity or short-term plays. Rewarding OGs who believed in our space from the early days, and those who are with us for the long run. Accessible, integrated into OS2, and built for sustainability.

What's in the open beta today is just the beginning. Our end goal is simple: build the best products in crypto. We have a long journey ahead, but we're going to keep shipping: NFTs, tokens, creator tools, AI x crypto, things we've just started mapping out. Because crypto needs truly great products.

To all the haters: you made us better. To those who stuck with us through the ups and downs: we're building the OpenSea you always believed in.

209.    As Defendant Finzer's tweet makes clear, the new version of OpenSea is, in several

respects, even more blatantly in violation of the securities laws than the old version.

210.    Not only does the new version support cryptocurrency tokens alongside NFTs for the first time, offer a host of new tools aimed at professional crypto traders, and appear to welcome back NFTs that had been banned, locked or delisted for, *inter alia*, violating the securities laws, but Defendant Finzer's tweet announced the upcoming release of an OpenSea cryptocurrency token known as $SEA.

211.    It is clear from the face of Defendant Finzer's tweet that OpenSea's new token will be used to reward long-time users of OpenSea, as well as traders who remain loyal to OpenSea over time.

212.    By promoting $SEA, a crypto token explicitly tied to the success of the OpenSea platform, Defendant Finzer is now violating the securities laws in the exact same way as the issuers of those tokens that even OpenSea 1.0 appears to have acknowledged were unlawful and banned from the platform -- tokens that behave like financial instruments, promising investors a payout based on the effort of others in violation of the *Howey* test.

213.    While the complete details of the token Defendant Finzer described have not yet been released, the $SEA token is a blatant violation of the securities laws, further tarnishing the NFTs that Plaintiff and others have purchased on OpenSea, and further underscoring that Defendants' statements luring unsuspecting investors to OpenSea were materially misleading.

### *The Class Has Suffered Significant Damages from Defendants' Actions*

214.    As a direct result of Defendants' false and misleading advertising of unregistered securities, Plaintiff and the Class—many of whom are retail investors who lack the technical and financial sophistication necessary to have evaluated the risks associated with their investments in The NFTs, and were denied the information that would have been contained in the materials

required for the registration of The NFTs—have suffered significant damages in an amount to be proven at trial.

## CLASS ALLEGATIONS

215.    Plaintiff brings this action as a class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired The NFTs within applicable limitations periods and were damaged thereby (the "Class"). Excluded from the Class are Defendants, members of the Defendants' immediate families and their legal representatives, heirs, successors, assigns, and any entity in which the Defendants are or have been officers, directors, or have or had a controlling interest.

216.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are thousands of members in the proposed Class. Plaintiff believes that Class members may be notified of the pendency of this action by mail, email, or similar messaging as directed by the Court, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

217.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the law that is complained of herein.

218.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

219.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the

questions of law and fact common to the Class are:

a)    whether Defendants violated the law;

b)    whether Defendants' promotional statements were false or materially misleading;

c)    whether The NFTs constitute securities under relevant law;

d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

220.    A class action is superior to all other methods of fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

<u>COUNT I</u>
**For Violations of the New York Deceptive Acts and Practices Unlawful Act
N.Y. Gen. Bus. Law § 349
<u>Against All Defendants</u>**

221.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

222.    Plaintiff invested in The NFTs and has been subjected to Defendants' scheme to mislead and deceive the marketplace, and asserts this claim on behalf of the Class. At the time of purchase, Plaintiff believed that The NFTs on OpenSea were not (unregistered) securities and had value, and accordingly paid a premium for The NFTs.

223.    Defendants engaged in deceptive and unfair practices prohibited by New York General Business Law § 349 by, among other things, misleading investors into believing that The

NFTs are not securities that should be registered and had value. Defendants took advantage of Plaintiff's trust and confidence by deceptively promoting the sale of The NFTs.

224.    Defendants' materially misleading promotion of The NFTs as not being securities renders those promotions and communications unlawful.

225.    The unfair and deceptive trade acts and practices of Defendants are consumer-oriented, are materially misleading, and have directly, foreseeably, and proximately caused damages and injury to Plaintiff and the other members of the Class.

226.    As a direct consequence of Defendants' unfair conduct and deception, Plaintiff and members of the Class have been damaged in that they spent money on The NFTs that they would not have otherwise spent, as Plaintiff and the Class was neither intending to buy unregistered securities nor to buy crypto assets from a marketplace rife with securities law violations. In addition, Plaintiff and members of the Class did not receive a lasting value for The NFTs, and they are left in an adverse position due to The NFTs being unregistered with relevant authorities. Because of Defendants' misleading practices in violation of New York General Business Law § 349, The NFTs are substantially worthless.

227.    Defendants' acts and practices amount to acts, uses, or employment by Defendants of deception and unfair commercial practices, false pretenses, false promises, misrepresentations, or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression, or omission, in violation of New York General Business Law § 349, deeming deceptive and unfair acts and practices illegal.

## COUNT II
### Violations of the New York False Advertising Act
### N.Y. Gen. Bus. Law § 350
### Against All Defendants

228.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

229.    Defendants were engaged in the "conduct of business, trade or commerce," within the meaning of N.Y. Gen. Bus. Law § 350, the New York False Advertising Act ("NY FAA").

230.    The NY FAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350.

231.     Defendants caused to be made or disseminated throughout New York, statements that were untrue or materially misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiff and the other members of the Class.

232.    Defendants violated the NY FAA, as Defendants deceptively and misleadingly marketed The NFTs as not securities nor needing registration and holding value when, in fact, The NFTs were unregistered securities and worthless.

233.    Had Plaintiff and the Class known this, they would not have purchased The NFTs or would have paid less for the NFTs, because Plaintiff and the Class was neither intending to buy unregistered securities nor to buy crypto assets from a marketplace rife with securities law violations.

234.    Accordingly, Plaintiff and the Class overpaid for the NFTs and did not receive the benefit of the bargain for The NFTs.

**COUNT III**
**Unjust Enrichment**
**Against All Defendants**

235.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

236.     Plaintiff conferred a monetary benefit upon Defendants, and Defendants accepted funds that they knew, or should have known, were derived from the sale of unregistered securities.

237.     With Plaintiff's money, Defendants enriched themselves.

238.     Defendants have knowledge of the benefits that Plaintiff conferred on them.

239.     Under principles of equity and good conscience, Defendants should not be permitted to retain the funds and assets they received as a result of their misleading promotion of unregistered securities to the unknowing Plaintiff.

240.     As a result of Defendants' conduct, Plaintiff has suffered damages in an amount to be determined at trial.

241.     To the extent permitted by law, Plaintiff seeks restitution of all funds and assets that Defendants have unjustly received as a result of their conduct alleged herein, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable, as well as all other relief the Court deems necessary to make them whole.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

a)      That the Court determine that this action may be maintained as a class action, that Plaintiff be named as Class Representative of the Class, that the undersigned be named as Lead Class Counsel of the Class, and direct that notice of this action be given to Class members;

b)      That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the laws set forth above;

c)      That the Court award Plaintiff and the Class damages in an amount to be determined at trial;

d)      That the court issue appropriate equitable and any other relief against Defendants to which Plaintiff and the Class are entitled;

e)      That the Court award Plaintiff and the Class pre- and post-judgment interest;

f)      That the Court award Plaintiff and the Class their reasonable attorneys' fees and costs of suit; and

g)      That the Court award any and all other such relief as the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 3, 2025                    **THE ROSEN LAW FIRM, P.A.**

*/s/ Phillip Kim*_____
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
Michael Cohen, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: mcohen@rosenlegal.com