UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

CRAIG ROSS, Individually and on Behalf
of All Others Similarly Situated,

                              Plaintiff,                    25-CV-1179 (DEH) (VF)

                -against-                          **OPINION & ORDER**

DEVIN FINZER and ALEX ATALLAH,

                              Defendants.

----------------------------------------------------------------X
**VALERIE FIGUEREDO, United States Magistrate Judge.**

       Presently before the Court is a motion to compel arbitration filed by Defendants Devin Finzer and Alex Atallah. ECF Nos. 10-13. Plaintiff Craig Ross opposes the motion. ECF No. 14. For the reasons stated herein, the motion to compel arbitration is **GRANTED**.

## BACKGROUND

       In 2017, Finzer and Atallah founded OpenSea, which is an application and exchange for selling NFTs and other crypto assets. ECF No. 9 ("Am Compl.") at ¶¶ 1, 101. An NFT is a non-fungible token stored on a blockchain, representing a digital record of ownership of a tangible or intangible item. Am. Compl. ¶ 71. OpenSea receives a fee for facilitating the sale of NFTs. Id. at ¶¶ 105-07. Plaintiff purchased NFTs on OpenSea. Id. at ¶ 16.

       After co-founding OpenSea with Atallah, Finzer continued to work at OpenSea, he presently serves as the CEO, and he is also on the Board of Directors. Id. at ¶¶ 17-18, 101; ECF No. 12 at ¶¶ 37-39. Atallah served as OpenSea's Chief Technology Officer until July 2022, and presently serves on its Board of Directors. ECF No. 12 at ¶¶ 38-39.

The complaint alleges that Defendants used their personal accounts on Twitter (now known as "X") to make "materially misleading promotional statements designed to lure unsuspecting investors to the NFTs offered for sale on OpenSea." Am. Compl. ¶ 5. Plaintiff alleges that NFTs are unregistered securities and Defendants have misleadingly promoted and advertised these purported securities through their Twitter accounts. Id. at ¶¶ 108-11, 114-91. Although none of the tweets that were allegedly misleading were posted by OpenSea, which has its own Twitter account, many of the tweets at issue are reposts by Defendants of an OpenSea tweet. See, e.g., id. at ¶ 184.

As Plaintiff does not dispute, OpenSea requires users to accept its Terms of Service. ECF No. 14 at 3; ECF No. 12 at ¶ 17.[1] The Terms of Service includes an arbitration agreement which provides the following:

> Please read this section, setting forth the Arbitration Agreement carefully. It affects your legal rights by requiring that you and OpenSea resolve any and all disputes with OpenSea through binding arbitration rather than in court, subject to the limited exceptions described below. This section applies to disputes between you and OpenSea and does not govern disputes between users or third parties. OpenSea does not provide dispute resolution services for disagreements between users or third parties, which must be resolved independently.

ECF No. 12-1 at Section 13.[2] As is relevant here, the arbitration agreement further states that "You agree that any dispute, controversy, or claim arising out of or related to your use of the Platform, products sold or distributed through the Platform, or your relationship with OpenSea will be resolved on an individual basis exclusively through binding arbitration," except for two circumstances that are not applicable to the dispute at issue in this case. Id.

---

[1] The page numbers referenced herein for citations to the electronic docket ("ECF") are to the original pagination in those documents.

[2] The Terms of Service that was in place during the beginning of the relevant time period (ECF No. 12-2) contains an arbitration provision that is substantively similar to the arbitration clause in the operative Terms of Service (ECF No. 12-1).

Additionally, the arbitration agreement in the Terms of Service contains a delegation provision which states that "[a]ny dispute between OpenSea and you regarding the construction, interpretation, or application of this Arbitration Agreement, including the enforceability, severability, revocability, scope, or validity of this Arbitration Agreement, shall be decided by an arbitrator and not by a court or judge." Id. Finally, the arbitration agreement indicates that the arbitration will be conducted by JAMS using either JAMS' "Streamlined Arbitration Rules (for claims under $250,000) or Comprehensive Arbitration Rules (for claims above $250,000)." Id. at Section 13 at ¶ 3.

In 2024, the Securities and Exchange Commission ("SEC") issued a Wells Notice to OpenSea, reflecting the SEC's view that the NFTs offered for sale on OpenSea were unregistered securities in violation of securities laws. Am. Compl. ¶¶ 6-7. Following this news, individuals who purchased NFTs on OpenSea commenced lawsuits, and the first such suit was in the Southern District of Florida, Shnayderman v. Ozone Networks, Inc. dba OpenSea, No. 24-CV-23616. ECF No. 14 at 5; ECF No. 11 at 1-2. That case, which was filed against OpenSea, was voluntarily dismissed. ECF No. 14 at 5; ECF No. 11 at 1-2

Plaintiff commenced this suit on December 2, 2024, in New York Supreme Court, alleging violations of New York General Business Law § 349 and § 350 and a claim for unjust enrichment. ECF No. 1-1. Following removal to this Court (ECF No. 1), Plaintiff filed an amended complaint on March 3, 2025 (ECF No. 9). The amended complaint alleges that Plaintiff was injured as a result of Defendants' deception, because Plaintiff purchased NFTs he would not have otherwise purchased had he known they were unregistered securities. Am. Compl. ¶¶ 222, 226, 232-34. Plaintiff contends that Defendants were unjustly enriched and "accepted funds" that they knew derived from unregistered securities, and Plaintiff seeks the return of "the funds and

3

assets [Defendants] received as a result of their misleading promotion of unregistered securities to the unknowing Plaintiff." Id. at ¶¶ 236-41. The amended complaint does not allege that any of the fees associated with Plaintiff's purchase of the NFTs were paid to Defendants, rather than to OpenSea.

## LEGAL STANDARD

The Federal Arbitration Act ("FAA") provides when a court shall compel arbitration and stay all proceedings before it:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

Federal Arbitration Act, 9 U.S.C. § 3.

Under the FAA, a written agreement to arbitrate is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA reflects "a strong federal policy favoring arbitration as an alternative means of dispute resolution." Ross v. Am. Express Co., 547 F.3d 137, 142 (2d Cir. 2008) (internal quotation marks and citations omitted); see also Green Tree Fin. Corp. v. Alabama Randolph, 531 U.S. 79, 91 (2000) (noting the "liberal federal policy favoring arbitration agreements") (citation omitted).

To determine whether to compel arbitration, courts perform a two-step inquiry that looks at contract principles "governed by state rather than federal law." Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel, 346 F.3d 360, 365 (2d Cir. 2003) (per curiam). At step one, the court considers "whether 'the parties enter[ed] into a contractually valid arbitration agreement.'"

4

Gordon v. Wilson Elser Moskowitz Edelman & Dicker LLP, No. 22-CV-5212 (JPC) (JEW), 2023 WL 2138693, at *2 (S.D.N.Y. Feb. 21, 2023) (quoting Cap Gemini Ernst & Young, U.S., LLC, 346 F.3d at 365) (alteration in original). At step two, the court first asks, "whether a court or an arbitrator should decide if the dispute falls within the scope of the agreement to arbitrate." Citigroup Inc. v. Sayeg, No. 21-CV-10413 (JPC), 2022 WL 179203, at *5 (S.D.N.Y. Jan. 20, 2022) (internal quotation marks and citations omitted). "[I]f the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." Gordon, 2023 WL 2138693, at *2 (quoting Henry Schein, Inc. v. Archer & White Sales, Inc., 586 U.S. 63, 69 (2019)) (alteration in original, internal quotation marks omitted). If it does not, then the court considers whether "the parties' dispute fall[s] within the scope of the arbitration agreement." Cap Gemini Ernst & Young, U.S., LLC, 346 F.3d at 365.

"Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986). To show "clear and unmistakable evidence of the parties' intent to delegate arbitrability to an arbitrator," parties may point to provisions of an arbitration agreement "explicitly incorporat[ing] procedural rules that empower an arbitrator to decide issues of arbitrability." DDK Hotels, LLC v. Williams-Sonoma, Inc., 6 F.4th 308, 318 (2d Cir. 2021) (internal quotation marks and citations omitted).

After the two-step inquiry, the Court examines whether "one party to the agreement has failed, neglected or refused to arbitrate." Beijing Shougang Mining Inv. Co. v. Mongolia, 11 F.4th 144, 162 (2d Cir. 2021) (internal quotation marks and citations omitted). "A party has refused to arbitrate if it commences litigation or is ordered to arbitrate the dispute by the relevant arbitral authority and fails to do so." Id. (cleaned up).

"In determining whether to compel arbitration, the Court applies a standard similar to that used at summary judgment and must construe all reasonable inferences in favor of . . . the non-moving party." Palmer v. Starbucks Corp., 735 F. Supp. 3d 407, 415 (S.D.N.Y. 2024); see also Barrows v. Brinker Rest. Corp., 36 F.4th 45, 49 (2d Cir. 2022) ("Because motions to compel arbitration are governed by a standard similar to that applicable for a motion for summary judgment, a court must draw all reasonable inferences in favor of the non-moving party.") (internal quotation marks and citations omitted). It is the burden of the party resisting arbitration to "prov[e] that the claims at issue are unsuitable for arbitration." Green Tree Fin. Corp., 531 U.S. at 91. "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H Cone Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983). "If the parties have in fact agreed to arbitrate, the district court must then stay proceedings." Kari Montanus v. Columbia Management Investment Advisers, LLC d/b/a Columbia Threadneedle Investments, No. 25-CV-2798 (PAE), 2025 WL 2503326, at *8 (S.D.N.Y. Sept. 2, 2025).

## DISCUSSION

The parties agree that Plaintiff entered into a valid and enforceable agreement to arbitrate when Plaintiff accepted OpenSea's Terms of Service. ECF No. 14 at 1, 6-10 (arguing about scope of arbitration clause but not disputing that clause is binding on Plaintiff); ECF No. 11 at 12-13. The parties disagree, however, as to whether Defendants can benefit from the arbitration agreement, given that they are not signatories to the Terms of Service that contains the binding arbitration agreement. In seeking to compel arbitration, Defendants argue that they are entitled to enforce the arbitration agreement because they are agents of OpenSea being sued for statements made in their capacity as agents of OpenSea. ECF No. 11 at 16-19. Defendants further contend that the question of arbitrability was delegated to the arbitrator in the Terms of Service and

cannot be decided by this Court. Id. at 13-15. Conversely, Plaintiff argues that Defendants cannot benefit from the arbitration agreement because it applies only to disputes with OpenSea. ECF No. 14 at 6-10. As to the issue of arbitrability, Plaintiff argues that it is one for the Court to decide because the delegation clause in the Terms of Service does not provide clear and unmistakable evidence of the parties' intent to delegate the issue of arbitrability to the arbitrator. Id. at 11-15. For the reasons explained below, the issue of arbitrability has been delegated to the arbitrator and Defendants, as agents of OpenSea, can enforce the arbitration agreement.

### A. The issue of arbitrability is for the arbitrator to decide.

Under the FAA, there is a general presumption that the issue of arbitrability—that is, the issue of whether the parties intended to submit a particular dispute to arbitration—should be resolved by the courts. See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944-45 (1995). Nevertheless, the issue of arbitrability may be "referred to the arbitrator if there is *clear and unmistakable evidence* from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator." Bell v. Cendant Corp., 293 F.3d 563, 566 (2d Cir. 2002) (italics in original, internal quotation marks omitted). Such clear and unmistakable evidence exists here.

First, the Terms of Service includes a delegation provision that expressly delegates to the arbitrator "any dispute" including one that concerns the scope of the arbitration agreement. ECF No. 12-1 at Section 13. The arbitration agreement has a delegation clause providing that "any dispute" concerning the "construction, interpretation, or application of this Arbitration Agreement, including the enforceability, severability, revocability, scope, or validity" is to be "decided by an arbitrator and not by a court or judge." Id. "Broad language expressing an intention to arbitrate all aspects of all disputes supports the inference of an intention to arbitrate

arbitrability[.]" Metro. Life Ins. Co. v. Bucsek, 919 F.3d 184, 191 (2d Cir. 2019). The arbitration agreement here contains such broad language, which courts have found constitutes clear and unmistakable evidence of an agreement to have the arbitrator decide gateway issues, such as whether the arbitration agreement applies to the dispute between the parties. See, e.g., DiTella v. TransUnion, LLC, No. 23-CV-11028 (KPF), 2024 WL 3594567, at *7 (S.D.N.Y. July 31, 2024) (concluding that provision that "delegates 'all issues' to an arbitrator, including all questions regarding enforceability and scope" demonstrates a clear intent "to submit arbitrability determinations to the arbitrator"); see also Indian Harbor Ins. Co. v. Build Group, Inc., No. 24-CV-4887 (LAP), 2025 WL 770049, at *4-5 (S.D.N.Y. Mar. 11, 2025) (concluding that "broad language" of arbitration agreement that provided for "[a]ny dispute . . . arising under, out of, in connection with or in relation to" the policy evidenced intent to delegate issue of arbitrability).

Second, the arbitration agreement also includes a provision requiring that the arbitration be conducted by JAMS and requiring that the arbitration rules of JAMS apply. ECF No. 12-1 at Section 13 at ¶ 3. Under the rules of JAMS, the issue of arbitrability is reserved for the arbitrator. See JAMS Streamlined Rules and Procedure, Rule 8(b); JAMS Comprehensive Rules and Procedure, Rule 11(b). "[W]hen, as here, parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." Contec Corp. v. Remote Solution Co., 398 F.3d 205, 208 (2d Cir. 2005); see also Emilio v. Sprint Spectrum L.P., 508 F. App'x 3, 5 (2d Cir. 2013) (concluding that parties "clearly committed gateway questions of arbitrability to the arbitrator" where arbitration clause included a provision requiring application of rules of JAMS); Pacelli v. Augustus Intelligence, Inc., 459 F. Supp. 3d 597, 608 (S.D.N.Y. 2020) (explaining that incorporation of rules that empower arbitrator to decide issues of

arbitrability is by itself clear and unmistakable evidence of intent to delegate such issues to arbitrator).

In short, the arbitration agreement contains clear and unmistakable evidence of the parties' intent to have an arbitrator decide issues of arbitrability, both through its plain text and the incorporation of the rules of JAMS. Plaintiff argues otherwise because he claims that the delegation provision, like the arbitration agreement, is limited to disputes with OpenSea, and not disputes with Defendants. ECF No. 14 at 11-15. As discussed, see infra Section B, this argument fails.

**B. Defendants can enforce the arbitration agreement.**

Plaintiff argues that the arbitration agreement applies only to disputes with OpenSea, and because Defendants are not OpenSea, they cannot compel arbitration pursuant to the arbitration agreement in the Terms of Service. ECF No. 14 at 6-15. To be sure, a signatory's agreement to arbitrate issues of arbitrability with another signatory—here, OpenSea—does not necessarily indicate an intent to arbitrate the same issues with a non-signatory. See Contec Corp., 398 F.3d at 209. However, so long as there is a sufficient relationship between the signatory (here, OpenSea) and the non-signatory seeking to compel arbitration (here, Defendants), the question of arbitrability can be delegated to the arbitrator where, as here, clear evidence exists of an intent to have such issues decided by the arbitrator. See id. ("In order to decide whether arbitration of arbitrability is appropriate, a court must first determine whether the parties have a sufficient relationship to each other and to the rights created under the agreement."); see also Mobile Real Est., LLC v. NewPoint Media Grp., LLC, 460 F. Supp. 3d 457, 477-78 (S.D.N.Y. 2020) (delegating question of arbitrability to arbitrator where sufficient relationship existed between signatory and non-parties seeking to compel arbitration).

9

A sufficient relationship exists between Defendants and OpenSea such that Defendants can enforce the arbitration agreement entered into with OpenSea. As such, the question of arbitrability of Plaintiff's claims against Defendants is one for the arbitrator to resolve. See Mobile Real Est., LLC, 460 F. Supp. 3d at 477 (noting that if a sufficient relationship exists between signatory and non-signatory, a non-signatory can "compel arbitration even if, in the end, an arbitrator were to determine that the dispute itself is not arbitrable because [the non-signatory] cannot claim rights under the . . . [a]greement") (alteration in original, internal quotation marks and citation omitted).

Finzer is founder and CEO of OpenSea and serves on its Board of Directors. Am. Compl. ¶ 17; ECF No. 12 at ¶ 39. Atallah, who co-founded OpenSea with Finzer, serves on the Board of Directors and until July 2022, was OpenSea's Chief Technology Officer. Am. Compl. ¶¶ 18, 101; see also ECF No. 12 at ¶¶ 38-39. Additionally, the misconduct alleged in the amended complaint is inextricably tied to each Defendant's role at OpenSea. At bottom, each Defendant is alleged to have used his Twitter account to promote, advertise, and "hype[ ] up," OpenSea, a platform Defendants co-founded, in order to "lure" investors to purchase NFTs sold on OpenSea without disclosing that such NFTs are unregistered securities. Am. Compl. ¶¶ 1, 4-5, 9, 101, 113-91. Many of the tweets that allegedly contained the misleading statements by Defendants are a repost of a tweet initially made by OpenSea. See, e.g., id. at ¶¶ 113, 115-16, 118. Each Defendant's Twitter account prominently displayed their respective affiliation with OpenSea. ECF No. 11 at nn. 8-14. And presumably it was each Defendant's role at OpenSea that made their tweets allegedly influential for Plaintiff and other investors who purchased NFTs on OpenSea. See, e.g., Am. Compl. ¶¶ 110-11, 117, 119, 127, 129. Further, Plaintiff seeks restitution of all funds paid to Defendants (id. at ¶¶ 236-37, 241), but the NFTs were purchased from OpenSea, and thus the

10

funds for which Plaintiff seeks restitution were paid to OpenSea (id. at ¶¶ 97, 99, 108). Consequently, to the extent Defendants facilitated the exchange of unregistered securities, it was to benefit OpenSea, and any profit by Defendants from the allegedly misleading statements was made through OpenSea, as there is no allegation in the amended complaint that any money was paid directly to Defendants. Id. at ¶¶ 196-98, 226, 233-34, 236-37. Additionally, the amended complaint alleges that, even if the NFTs are not unregistered securities, Defendants nevertheless made materially misleading statements because they "knew that securities law violations at OpenSea were rampant." Id. at ¶¶ 201-02. But that knowledge, if it exists, would have been possible only because of each Defendant's role at OpenSea.

It is plain from the allegations in the amended complaint that Defendants are being sued for statements made in their capacity as co-founders of OpenSea, members of the Board, and high-ranking executives within the company. Generally, a corporate executive, employee, or board officer is treated as an agent of the company. See Doe v. Bloomberg, L.P., 36 N.Y.3d 450, 460 (2021) (explaining that a corporate agent is someone "authorized to act on behalf of a corporation" such as "all employees and officers who have the power to bind the corporation"); Hamerslough v. Hipple, No. 10-CV-3056 (NRB), 2010 WL 4537020, at *2-3 (S.D.N.Y. Nov. 4, 2010) (explaining that non-signatory corporate directors could enforce arbitration agreement as agents of signatory corporation); cf. Holzer v. Mondadori, No. 12-CV-5234 (NRB), 2013 WL 1104269, at *9 (S.D.N.Y. Mar. 14, 2013) (explaining that non-signatory could not compel arbitration where non-signatory "is not now, nor has she ever been, an officer, director, member, manager, employee, shareholder or agent of" signatory to arbitration agreement). And courts have consistently concluded that an agent of the corporation, such as an officer or director, sued in their capacity as agents of the corporation, are entitled to enforce the arbitration agreement

11

entered into by the corporation.³ See, e.g., Hirschfeld Prods. v. Mirvish, 88 N.Y.2d 1054, 1056 (1996) ("Federal courts have consistently afforded agents the benefit of arbitration agreements entered into by their principals to the extent that the alleged misconduct relates to their behavior as officers or directors or in their capacities as agents of the corporation."); Roby v. Corp. of Lloyd's, 996 F.2d 1353, 1360 (2d Cir. 1993) ("Courts in this and other circuits consistently have held that employees or disclosed agents of an entity that is a party to an arbitration agreement are protected by that agreement."); Sanders v. Forex Cap. Markets, LLC, No. 11-CV-0864 (CM), 2011 WL 5980202, at *11 (S.D.N.Y. Nov. 29, 2011) (granting motion to compel arbitration and finding that where plaintiff and defendant company entered into arbitration agreement, claims against the company's CEO "must be arbitrated"); McKenna Long & Aldridge, LLP, 2015 WL 144190, at *7 n.8 (collecting cases supporting "the proposition that an arbitration agreement may be enforced by and against agents, employees, and/or officers of a corporate entity").

Plaintiff argues that the agency relationship between Defendants and OpenSea is inapplicable because Defendants are not being sued for the conduct of OpenSea and instead are being sued for their own conduct. ECF No. 14 at 17. But Plaintiff ignores that, as alleged in the amended complaint, the purported misconduct by Defendants derives from their respective roles at OpenSea, as well as on misconduct by OpenSea itself. Indeed, Defendants would have

---

³ Defendants' conduct falls within the scope of their agency relationship with OpenSea even if they acted for the dual purpose of furthering their own interests, because there are no allegations in the amended complaint even suggesting that Defendants' acts were "for no purpose of or benefit to" OpenSea. See Francois v. Metro-N. Commuter R.R. Co., 107 F.4th 67, 72 (2d Cir. 2024). To the contrary, the amended complaint alleges that Defendants' tweets "w[ere] designed to make people buy unregistered securities," and the fees paid by purchasers of those NFTs were paid directly to OpenSea, demonstrating that OpenSea benefited from Defendants' tweets promoting NFTs on the platform. See, e.g., Am. Compl. ¶¶ 5, 104, 107, 113-14.

committed no misconduct if OpenSea did not sell (and Plaintiff had not purchased) unregistered securities. Where the allegations against the non-signatory relates to their conduct as agents of the signatory and the allegations of wrongdoing derive from the conduct of the signatory (here, OpenSea), courts have permitted the non-signatory to enforce the arbitration agreement. See, e.g., Roby, 996 F.2d at 1360 (concluding that non-signatories to arbitration agreement could compel arbitration where non-signatories were employees of entity that signed arbitration agreement and misconduct alleged against the non-signatories was "completely dependent on the complaints against" the signatory to the arbitration agreement); Hamerslough, 2010 WL 4537020, at *2 (allowing non-signatory corporate directors of signatory company to compel arbitration where non-signatories were employees of signatory and claims against non-signatories derived from misconduct of signatory employer).

Plaintiff also argues that permitting Defendants to enforce the arbitration agreement would circumvent the intent of the parties because elsewhere in the Terms of Service Defendants are defined as "OpenSea Parties" and the agreement to arbitrate is only with "OpenSea." ECF No. 14 at 6-10, 19-20. Plaintiff contends that to read Defendants into the definition of "OpenSea" in the arbitration agreement ignores the plain text of the entire Terms of Service. Id. at 8. This argument is unpersuasive for several reasons. First, the term "OpenSea Parties" is not a term used in the arbitration agreement. It is a term defined in the Indemnification provision of the Terms of Service. ECF No. 12-1 at Section 12. The arbitration agreement itself does not reference "OpenSea Parties." Second, Plaintiff's reliance on a term from another section of the Terms of Service to narrow the scope of the arbitration agreement would circumvent the intent of the parties as evidenced by the terms of the arbitration agreement itself. The arbitration provision states that "[y]ou agree that *any dispute, controversy, or claim arising out of or related to your*

13

*use of the Platform*, products sold or distributed through the Platform . . . will be resolved on an individual basis exclusively through binding arbitration[.]" ECF No. 12-1 at Section 13 (italics added). The agreement applies to "any dispute" arising out of Plaintiff's "use of the Platform," including "products sold" on OpenSea. This broad provision evinces an intent to capture the acts of agents like Defendants and the conduct by Plaintiff which involved the purchase of NFTs on OpenSea. See Gateson v. Aslk-Bank, N.V., No. 94-CV-5849 (RPP), 1995 WL 387720, at *1, 5 (S.D.N.Y. June 29, 1995) (concluding that arbitration clause that provided that "any controversy arising out of or relating to this Agreement or the breach hereof" shall be governed by arbitration required arbitration of claims against non-signatory individual defendants who were employees of signatory company because claims arose out of defendants' actions as employees of signatory company).

Third, applying Plaintiff's reasoning to the arbitration agreement would ignore case law that makes clear that a company need not expressly enumerate employees or agents in an arbitration provision to have those individuals benefit from the arbitration provision. See Dunmire v. Hoffman, No. 5-CV-4852 (DAB), 2006 WL 2466248, at *4 (S.D.N.Y. Aug. 24, 2006) (stating that "[c]ourts in this Circuit have not required employers to expressly enumerate employees in arbitration provisions"); Roby, 996 F.2d at 1360 (finding that plaintiff's complaints against individual agents who, while acting on behalf of a principal, allegedly violated securities law are subject to the same arbitration agreement made between plaintiffs and the principal).

In short, Plaintiff does not dispute that he is a signatory to the Terms of Service containing the arbitration agreement. And for the reasons explained, Defendants, as agents of OpenSea being sued for conduct within the scope of that agency relationship, may enforce the arbitration agreement in the Terms of Service. Regardless, because there is clear and

unmistakable evidence of the parties' intent to delegate issues of arbitrability to the arbitrator, whether Plaintiff's claims fall within the scope of the arbitration agreement is for the arbitrator to decide.

## CONCLUSION

For the foregoing reasons, Defendants' motion to compel arbitration is granted and the case is stayed pending the outcome of arbitration. See 9 U.S.C. § 3 (mandating that a court "*shall* on application of one of the parties stay the [case] until such arbitration has been had" if the court is satisfied that the issue involved in the suit is referable to arbitration) (italics added). The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 10 and to stay this case.

**SO ORDERED.**

DATED:   New York, New York
         October 8, 2025

_____
VALERIE FIGUEREDO
United States Magistrate Judge